Mr. Chamberlain, we're in no rush, but whenever you're ready, we'll be happy to hear from you. Good afternoon, Your Honor. My name is Ames Chamberlain. I'm an Assistant Federal Public Defender for the Federal Public Defender's Office in the Middle District of North Carolina, and I represent the appellant, Ervin Leggette, today. When Officer Rochelle patted Mr. Leggette down and subsequently interrogated him about the firearm that was found in a trash can at Reynolds Park, under the totality of the circumstances, what started as a teary stop transformed into a custodial interrogation for purposes of Miranda. We are asking this court to find the statements made by Mr. Leggette in the parking lot and his subsequent statements made in the detention center in Missville as they were obtained in violation of Mr. Leggette's Fifth Amendment constitutional rights. There are two main issues before this court. The first is, was Mr. Leggette questioned under circumstances in which his freedom was curtailed to a degree associated with a formal arrest at the time he was questioned by the officer in the parking lot? And then, if so, and if he was in custody when he was questioned in the parking lot, were his unworn statements involuntary based on his actions in the parking lot, and did they make those subsequent statements at the detention center involuntary, such that both statements would be in Missville? Can you differentiate your case from the United States versus Garner, where we found that an officer who frisked a defendant and twice asked him if he had anything illegal in the car without providing a random warrant was permissible? Yes, Your Honor. My recollection of that case is that Mr. Garner was asked to step out of the car. He was asked if there was a, I think initially he was asked whether there was anything in the car. And then once he gets to the back of the car, he was asked whether there was a firearm in the car. He hung his head down and was asked again, and he subsequently acknowledged it. This case is different for a number of different reasons. Mr. Officer Rochelle, it wasn't so much that he was asking him, he was basically accusing him of possessing the firearm that was found in the trash can. And he did it approximately three or four times. And Mr. Leggett repeatedly denied knowing about the firearm. And it was only on the last occasion after Officer Rochelle made a statement to the effect of, come on, be honest with me. And he said something to the effect of, we've been doing this too long, and indicated that this can go a long way for you in terms of your cooperating. Only then did he admit that he had the firearm and went on to say that he obsessed with firearm protection. Is that, would your holding apply in any other circumstance? So what I'm trying to understand is sort of the scope of what you're asking us to say. And I think what you're saying in response to Judge Floyd is that anytime an officer says words to the effect of, be honest with me, it'll help you out if you tell me what happened, that that is involuntary because it's, that is like a coercive questioning. I mean, that's the sort of, I mean, I do that to my children regularly, right? And I don't think it's coercive. Be honest with me. I'll try to help you out with mama if you give me some information, right? Like that's, that doesn't seem coercive. I think that's coercive, sounds to me. I hope not. That's, do you understand the rub? I understand. And that's not the argument that I'm making, Your Honor. Every case is different when it comes, they're very factually driven when it comes to these Fourth Amendment, Fifth Amendment issues. And every case is unique in its own facts. I mean, it is, but you know, we've got the case that we talked about, which is pretty similar. And so you say, yeah, but that's different because he said, be honest with me, right? And like that, that means, that suggests that you think that that's what matters in this case. Yes, Your Honor. And first, I would acknowledge the authority of cases that indicate that when an officer is making general assurances that end up being followed through with, they have to do with cooperation or being honest. The cases have upheld those statements as not being obtained in violation of the Fifth Amendment, not being coercive. I mean, the courts say, like, the police officer doesn't even have to be honest, right? I mean, he can mislead in his questioning, and that's not coercive. That's true, but that's one fact in this analysis, and it's under the totality of the circumstances. So let me kind of maybe step back and ask a question. Do you contend that the district court misstated the applicable law, either for the scope of a Terry detention or for the requirements of custody? No. So when I'm talking about a legal error, we're talking about the application of the facts here to the law that the district court cited, right? And pretty much everyone agrees on? Yes, Your Honor. But I would tell this is a unique situation in that I wasn't counsel at the motion to suppress hearing or the attorney that wrote the brief. But in this case, I would ask the court, and the court's correct, but much of the analysis at the hearing was there seemed to be an agreement between parties that the detention began at the time that Mr. Legg was frisked or patted down by the officer. And I am asking the court to look back farther. And this goes both to whether he was in custody and both to whether the statement was was voluntary course. And so when when Officer Rochelle encounters Miss Marshall and Mr. Leggett over by the picnic tables, it's dark. It's a uniform officer. He has a firearm. He says the park closed at 1030. It's not dispute. It was midnight. And at that point in time, he has Miss Marshall and Mr. Leggett. Yes, I just wanna make sure I wonder if you could go through the time. At that point, he's got reasonable suspicion that they are trespassing. He's got more than reason, right? I mean, I know all that's really needed, right? It's reasonable suspicion, but he's got a reasonable suspicion that he's found a man or woman in a park at midnight. And he's got at least reasonable suspicion that they are trespassing. And so he's entitled to investigate that. Absolutely. Right. And he can choose to arrest them for that. Write a citation for that or just tell him, hey, get out the park. Right. He's not required to do any of those three actions at that point. That's correct. And in part, like we might expect that he's going to investigate and find out why they're in the park and that might inform his decision as to what he's going to do. That's correct. Okay. All right. So now tell me why he's in custody at that at that point. As soon as he starts investigating why they're in the park. Well, so the standard or the analysis is from a reasonable person in the in the suspect's position. So in Mr. Leggett's position. So from the very outset, he's basically been told he is trespassing. He is committed an offense for which he can be arrested. And ultimately, that's one of the offenses for which he is arrested. And that is one more factor that didn't get a lot of attention at the hearing itself. But this court can consider. Right. That's exactly the point. He could be arrested. Right. And so, OK, well, that sort of weighs heavily in using my discretion to arrest him rather than, you know, giving his gun back and sending him on his way. Right. That that's exactly what we want an officer to do is to investigate. I found some my trespassing. Let's investigate. Learn a little bit more about whether this is a case that should be charged or should not be charged. And I'm not faulting the officer or saying that he did anything inappropriate, but against one more factor from the defendant's perspective that puts him in a position, not just that, that he's not free to leave under under a search. But it's one more factor that weighs in favor of him being custody. So he's with me. Let's assume let's assume you're right there. But that's kind of why I asked the question. Do you contend there's a error of law? And I think you said there's not. And let's talk about the custody. I mean, you talk about factors in the district court laid out four or five factors that arguably would cut in favor of a custody determination. But then it listed five or six or seven that cut the other way. And, you know, that's you got a pretty tough standard of review for us. I mean, you know that those facts are in the record. The district court looked at the things you're talking about, said, yeah, this, but that. And under a clear error standard where we're supposed to construe the evidence in the light most favorable to the government. How do we how do we do that when there's a litany of facts that support that determination that are part of the factors that the courts have said are appropriate to consider? Well, this court should consider that the questioning of Mr. Leggett while it was questioning, it was it was accusatory in nature. Each question, which is different from the from the Garner case when they're asking, is there anything in the car? Do you have anything? Every single one of those questions from Officer Rochelle to Mr. Leggett was. I think that question in the Garner case is not accusatory. Right. And you're like, do you have anything in the car? And the guy hangs his head down and it's like, do you have anything in the car? I mean, that's an accusatory. I mean, in some sense, they're just as accusatory as be honest with me. Like, is the gun that we just found yours? They seem equally accusatory in my mind. I would contend that the Mr. Leggett situation is is distinguishable from Mr. Garner situation. And it goes on for approximately two minutes from the time that that Sergeant Mulgrew finds the firearm. So I think everyone would agree that Terry's stop had already taken place. And do you agree when they find the gun in the trash can by where they had been in the park, that they had reasonable suspicion at that point that he had a firearm? What's what's troubling is that Mr. Leggett was the target of the investigation regarding the firearm from the very beginning. There's two people there. There's Miss Marshall and Mr. Leggett. The investigation solely targeted Mr. Leggett. I don't know why that is. I don't know what was in the officer's mind. But when Sergeant Mulgrew finds the firearm. I understand. Maybe he had reasonable suspicion of two people that had the gun, but they had reasonable suspicion that he was involved with the firearm. And given that it is hidden, they would have reasonable suspicion that he is unlawfully in possession of the firearm. I'm just asking, do you agree at that moment in time when the pat down occurs that they had reasonable suspicion that he was involved illicitly in some manner with a firearm? Yes. We're not challenging the pat down. And I don't know. And then maybe I'm having a little trouble. Right. So they've got a reasonable suspicion at that point. He can do a Terry stop. He can do the pat down. And as part of a stereotype and Terry stop, as in learner, you can do at least some investigation of the crime, just like he could do with the trespass. You can ask, why were you here? What were you doing? What's going on? Because I'm entitled to investigate a little bit along with patting you down. So why is it? Why is it that way? I mean, I don't mean to just ask the same question again. No, I'll try to do a better job answering the question. There's two investigations that are emerging. There's the there's no question that Mr. Leggett has has been told that he is committed a second degree trespassing, which is an offense for which he can be arrested. So so he can also not be arrested or not charged. I mean, all three of those that we just established, those are all three options. That's true. That's true. But we would argue that in Mr. Leggett's position, that goes to whether a reasonable person in Mr. Leggett's person position would believe that he was actually in custody. And that's why all these factors matter. And it also matters. You may wonder why I'm pointing or why I'm pointing out the fact that he was the sole target of the investigation is this is this is being communicated over radio. So that's I'm just thinking about that. I mean, so that means a person who's, you know, going, you know, too fast down the highway is pulled over for obvious speeding. And then an off. Yeah. And then an officer sees a gun in plain sight and then ask a couple of questions about the gun. It's like I mean, you're suggesting, I guess, that the person who commits the first crime or engages in activity that is reasonably suspicious of a crime somehow comes out on the better end of the of the of the inquiry here. I think what's different about that, if someone's pulled over for a traffic violation, it may not amount to an arrestable offense. But it might. You can't get arrested for some. Right. I mean, that's what we don't know. Right. And that would certainly that would certainly factor in. I mean, if the person's going 110 in a 45 zone, that person is well aware that they could be arrested and may believe at that point that not just that they're not free to leave, but that their freedoms curtailed to a point that it came out to a formal arrest. So it sounds like the two things that you're you're hanging your hat on, maybe as distinguishing factors, is that there was the trespass conduct created, you know, an increased appreciation of custody or a feeling that objective feeling of custody and then the accusatory nature of the question. So those the two distinguishing factors that this makes this case different from your perspective? It's more than that, your honor. It's late at night. Well, it is a public park. There's no one else there besides. Right. But he's he's got to be comfortable late at night in a park. He's the one that went there. Right. I mean, there's no reason we would think of that. He's uncomfortable. I mean, a reasonable person who goes to a park in the middle of the night is it can't be like particularly concerned about it. Right. When you encounter a police officer and you're in the park after hours and it's dark and you're in the presence of two armed officers. And there's two patrol vehicles who parked in close proximity to the white Subaru parked diagonally and their officer, Rochelle, acknowledged during cross-examination that he at times will rest his hand on his firearm when he's questioning a suspect. And it's possible that he could have done on this occasion. All those things weigh in favor of someone being in custody and creating a coercive environment. Did you listen to the tone on the tapes? It didn't sound. It sounded pretty pleasant. Well, we acknowledge that I think it was referred to as moderate. I think both sides referred to the tone or general demeanor of the office was moderate. But the words he was using was, come on, man, tell me how that firearm got there. It wasn't. Is there anything back there? Do you know anything about there? It wasn't that type of investigation. It was, come on, that officer didn't plant that firearm there. You know what it's doing there. We've been here long enough. All these things factored in and changes the dynamics when the officer says it's going to go a long way to helping you, if you'll be honest with me. And while two minutes doesn't sound like a long time, when he's repeatedly accused in that context, out at night, it's dark. The officer testified even with the headlights of patrol vehicles not being illuminated. It was dark. I see my time is up. I'm happy to answer any questions. Thank you, counsel. Thank you, Mr. Reese. We're happy to hear from you. Good afternoon. May it please the court. Morgan Reese on behalf of the government from the Middle District of North Carolina. Your honors, the question before the court this afternoon is whether the district court erred in denying the motion to suppress Leggett's unformed statements as a result of a valedictory stop. The answer to that question, considering the evidence in the light most favorable to the prevailing party is no. These questions and answers were given as part of a valedictory stop. And further, in the voluntary custody analysis, the statements were voluntary. In April, on April 24th of 2019, Officer Rochelle was on duty with the Winston-Salem Police Department. He drove past a park sometime between midnight and 1am. The park was closed. He saw a car parked there, so he went to investigate. Upon approaching, the car was empty, so he walked further into the park. And that's where he encountered two people, Leggett and Marshall. The three of them. And whether anyone else was in the park who was armed and then said limited questions to this or within the confines of Terry. And my question is, did any officer testify that those were the reasons they were conducting the investigative questions to Mr. Leggett that they did? Certainly, Your Honor. So the officers who both testified, they are focusing specifically on Officer Rochelle because he was the one who conducted the questioning of Leggett. He tells the court in the district court suppression hearing that it was unusual to find firearms in trash cans at night. And so as part of the district court hearing, I do believe that he also informed the court as part of his testimony that certainly they're trying to figure out who owns the firearm and what the whole situation was. And it's highly unusual for officers to find a firearm in a trash can at night. I hear you. And, you know, that conclusion makes some sense to me, too. I'm just trying to see if anyone said it from an evidentiary set evidentiary standpoint. The lawyer argued it. I don't know if that's you or someone else, but the lawyer argued it after the testimony went in. I'm just trying to figure out as to whether there was actually evidence that one of the concerns was either officer safety or there was someone else in the park. Your Honor. So for Officer Rochelle's testimony, he goes through what happened, obviously, and provides that factual basis. I don't recall specifically what he said about what his motivation was at that point in time. Does that matter? I mean, if the district court says that an appropriate reason is reason A, and in theory, that's a good reason, a legitimate reason. But the testimony is I did it for reason B. Does that create a problem for us? Your Honor, I don't think that it does. And I'll tell the court why. That's the instance for this court is in the analysis is whether the officer diligently pursued a means of investigation to confirm or dispel his suspicions. So in his cross-examination, he does admit that he believed the firearm was Legos. And so his questioning was obviously to confirm or dispel that suspicion. And so I think that in this analysis, the court has to have answered that inquiry. It's not a bright line rule. Is that inquiry? So Judge Kotelbaum's question suggests that the inquiry is a subjective one, right, where we tend to think about cases like Wren and otherwise, that we analyze these questions not based on the subjective belief or rationale of the officer. That might be evidence, but there's an objective inquiry. We talked a little bit about the objectivity on the Mr. Leggett side, but in the inquiry, also fundamentally an objective inquiry and not specifically what he happened to be motivated by. It certainly is, Your Honor. And based upon that objective inquiry, this court has the ability to look at the totality of the circumstances. So certainly, whether or not the officer directly testified that I was inquiring about reason A, but the district court reasoned about reason B, to your point, Your Honor, it is an objective inquiry. So your position would be that that conclusion by the district court is not a statement that the officer subjectively believed that officer safety was the rationale, but instead it was objectively reasonable to have that belief. And we don't have to ask the question of whether that was what was between his ears at that particular moment. That's absolutely correct, Your Honor. Your Honor, so under this analysis with Terry, we have this two-pronged approach, but this first element of whether or not the officer's actions were justified at the exception really isn't an issue here. Everyone agrees this was a lawful Terry stop based upon the firearm. So then it does turn to the second inquiry of whether the officer's subsequent actions were reasonably tailored to the circumstances that justify the stop. So we have to make an inquiry about scope and duration. And then that refers back to the no-bright-line rule that I mentioned earlier in looking at the totality of the circumstances. I don't know if this goes, I think it would go into scope, I guess. Does the nature of the questions, there's been discussion over they were accusatory or more accusatory than other cases. Forget what side of the line that falls on. But does whether the tone or the coercive nature of the questions matter as to whether it's still within Terry? So certainly, Your Honor, off the bat, Terry is obviously a seizure. We're not contesting that. But Terry is a unique circumstance because as the Supreme Court has held, it does not exert upon a detained person pressures that sufficiently impair his privilege against self-incrimination so as to require that he be warned of his constitutional rights. So in answering your question, I think that's an important framework. And that was from Berkmer versus McCarty. That depends on whether your questions are Terry-type questions, right? Or is there a way that you can be asking questions, which the law says officers can do, in relation to a stop. Is there a way you can do those in a way that moves you into a situation where you need those warnings, even if the subject matter might be within the scope of a Terry search? Well, Your Honor, I think the analysis of an investigation, this court holding that coercive nature of questioning during Terry, I think Terry, in and of itself, officers, they're in the moment. They're in the heat of the action. They're trying to decide. They have concerns about officer safety. They have concerns that reasonable, they have reasonable belief that criminal activity is afoot. So questions in and of themselves could be coercive in nature. The government does not contend that they were coercive in nature in this instance, but I don't think that that would necessarily tilt the favor in finding that a Terry stop had been unlawfully extended, just given the nature of Terry stops themselves. I mean, if you look at the initial Terry case where the officers are watching individuals case to bank to rob a store, the officer has to act on their feet and make a quick judgment call. The question then becomes, did that extend impermissibly? Do you know the timing of, was the gun found first before the frisk or after? Your Honor, the gun was found first. So both in the district court testimony, the court can review that, but also in the supplemental joint appendix, video number four, the court can watch that. Does that make a difference? Your Honor, it certainly does because the firearm was found in the trash can. The officer, Sergeant Mulgrew, then radius officer Rochelle, that transformed the nature of this interaction. Do you agree that before, you don't have to agree, but well, maybe. Do you agree that before they found the gun, that they would have lacked reasonable suspicion to do a Terry pat down? They had reasonable suspicion of a trespass, but it being a little hard to say that there was reasonable suspicion that he would be armed and dangerous until they found the gun. I think that's an appropriate analysis, Your Honor. Certainly the firearm changes the whole analysis, but I think the district court also made an important note in its findings and conclusions here about what impact that prior interaction has on everything that happened after the Terry frisk, which was that Leggett and Marshall were going to have to return to their parked car anyway, when officer Rochelle encountered them in the park. So they all were walking back to an area where they were going to have to return. So any sort of environmental condition that would have possibly impacted or otherwise said it's coercive or custody, they were going to be there anyway. Well, they will not be there with two police cars and two police. I think there's facts both ways on that, but it's not like they're in the same situation they were expecting. Certainly they had other guests with them at that point in time, Your Honor, when they were returning to the parking lot, but officer Rochelle didn't have his firearm drawn. He didn't have a flashlight out because it was dark. And then he walks back to the parking lot with the two of them. He even leaves them at a point in time because he has to go back to his car to get something to it from his car before he goes back and talk to them again. One of the things your colleague suggested is that it matters here that the trespass offense was an arrestable one. And so a reasonable person who is under investigation for trespass would then assume, I believe, or know that since it was an arrestable offense, they were likely to be arrested or they were arrested. Can you talk about that? Do you agree that the nature of the offense matters? And the question is how and at what point? Maybe there's a murder. I mean, you could imagine a little bit of a difference here, but how does that play into the calculus as to whether someone's in custody? Your Honor, to first answer that question, I do want to point out that everyone, both parties here agree that the Terry stop was valid once the firearm was found. And so I do think that's an important distinguishing factor because the analysis then basically changes because everything that happened prior to that doesn't really impact the Terry stop. It impacts the state of mind potentially or the objective state of mind of the defendant. That's absolutely true, Your Honor. And I think that's the point he's making, that there's this factor. He's got a greater risk. I may be arrested. And in the custody analysis, that matters. Certainly, I understand the court's point with that. However, I'm not making a point. I'm just we're asking your response. Yes, Your Honor. I do. I do see that. However, if you want to turn to a custody analysis, a true custody analysis under whether or not the suspect's freedom was curtailed to such a degree associated with formal arrest. Let's look at the factors. We consider things like time, place, purpose of the encounter, the words used by the officer, the tone and general demeanor, the presence and number of officers, potential displays of weapons, physical contact, isolation or physical restrictions. So taking each one of these individually, Leggett was never placed in handcuffs. It was a reasonably relaxed conversation. Given the circumstances, there were no weapons drawn. They certainly had weapons on their holsters, but they were not drawn. One officer was asking the questions in the circumstance to both Leggett and Marshall, who was standing right there. There were no threats made in the police department. What do you do with your colleague's concern that the police were selectively targeting Mr. Leggett and ignoring Ms. Marshall with respect to the gun? Maybe there was some trespassing for both of them, but once they found the gun, they sort of said, we're going to talk to the guy and we're not talking to the lady. That is what happened, Your Honor. There is no discussion. I got that. What do you do with that fact? If the court looks specifically at the interaction between the three individuals as they're standing in the parking lot, it's a little bit more nuanced than what we've been talking about, which is just direct, categorizes accusatory questions. The interaction, if the court looks at video number four, starting at about three minutes and 12 seconds, that's when the frisk concludes. The officer turns to Leggett and says, what's the gun over there for? Be honest with me. Leggett then admits to him, we were over there, but I didn't have no gun. Rochelle then says, where's that? Leggett responds. And there's some back and forth at that point in time. Then 15 seconds later, Rochelle asks, you were down there by the benches to which Leggett responds. Yeah, I don't know where he got it from, though. We were down there by the benches. Miss Marshall then interjects herself at that point in time, and she starts talking about why they're out in the park and the circumstances. Leggett then starts talking again, and some of the audio is muffled. So this is just clips of what was happening. But then he volunteers. I just did 15 years. So what we have at this point in time... I got it at that point. As soon as he says that, I get the focus that goes to him. But at least my regulation, she doesn't get the frisk that he gets. Yeah, correct. I mean, the tenor of the conversation, I guess she interjects at some point. But the tenor of the conversation and watching the video and the muffled pieces that we can get out of it is that the focus of the investigation is on Mr. Leggett. And my question is, assume that sort of like... I mean, it is factually true, but you can also assume it. Does that matter to the analysis? No. Help me know why. It doesn't matter to the analysis, because when you consider the totality of the circumstances here, the officers can only ask questions of one person at one time. They certainly can then turn to her after they're done with asking questions. But the frisk looks a little different, right? If he thought both were a risk, he would have frisked them both and then asked questions. He didn't do that, Your Honor. But I don't think that the lack of action or lack of asking questions invalidates what he did. It may not. Let me ask you if something else matters. I don't think if one of the things he was arrested for was trespass. Is that correct? Your Honor, I don't have that information in front of me. I know that the officer said that that's what he was intending to do. Correct. And I don't think he was trespassing any more than she was. So does the fact that he thought about arresting him for trespass and not Ms. Marshall matter? No, Your Honor. It doesn't matter because, again, what the officer did not do does not invalidate what he did do. And so we look at what he did do, and that's the question is, is that appropriate under the law? And the answer is yes, considering the scope of the Terry stop and then considering the scope of the questions, which both in context and duration lasted 90 seconds from the time of the first, the time of the admission. If you want to go further, you could say two and a half minutes from the time of admissions, from the time of the first to the time of the arrest. Putting this in context, that is not an unreasonable extension of a Terry stop. If the scope of this Terry stop was to investigate a firearm that was found in a trash can after dark in a closed park and there were only two people nearby, then that scope of questioning was completely valid and legitimate and limited to that inquiry. Because of that, this Terry stop was not only valid at its inception, but throughout questioning continued to be valid. Your Honor, the defense would argue that because nothing of evidentiary value was found as part of the frisk, then it should have stopped. However, as the court has pointed out, that's simply not what the standard is in this circuit. The Gardner case is very clear on that point where they conduct a traffic stop. They do a frisk of the defendant and they find nothing. They were able then to ask a couple more questions. And at the conclusion of that, they locate, they get an admission and find a firearm. Further, the defense would have us establish a rule where we have to, officers would have to end questioning if the defendant either answers in the negative or is otherwise unresponsive to questioning. And that's simply not, again, just not the standard. The standard is whether or not the officers were diligently or diligent in their pursuit of their investigation, and whether it was narrowly tailored to the scope of the stop, which it was here. Your Honor, if the court has no further questions. I want to make sure I heard you right. I thought you said the gun was found before he did the frisk. Yes, Your Honor. That's correct. The gun was found. And then the officer, Sergeant Mulgrew, radioed to start to Officer Rochelle and said pat him down. So what does that argument about having done the frisk and don't find anything on him, what does that have to do with anything? Your Honor, from the time of the frisk to the time of the admission is really a point about the duration of the stop. If the court watches the entire body camera footage from Officer Rochelle at the scene, from the time that it starts, which is not necessarily the time that Officer Rochelle got on the scene, it was just the time that it was activated, it's just about just under five minutes long from that entire time. So even looking at the maximum time that Officer Rochelle was out on scene, five minutes is simply not too long for an officer to conduct an investigation part of the way through firearms found in the dark in a closed park. So if there are no further questions from the court, I will conclude and just say we ask the court uphold the findings of the district court and denying this motion to suppress. Thank you. Thank you, Counselor. Mr. Chamberlain, you got a few minutes if you'd like. Thank you, Your Honor. Your Honor, I would just reiterate that it's our position that the Terry stop began from the moment Officer Rochelle came into contact with Mr. Leggett and Ms. Marshall. So from the moment he interacts with them out at the picnic table, so it didn't happen when he pats him down. To clarify about when the firearm was located, after Ms. Marshall and Mr. Leggett walked back with Officer Rochelle from that area where the picnic tables were, Sergeant Mulgrew, who had arrived, walked down in that direction, searches the trash can, finds the firearm, and then he radiosed Officer Rochelle, pat him down. He didn't know his name, but that was Mr. Mr. Leggett. So we would contend again that that Terry stop began earlier. While it's absolutely true that in a Terry stop situation, the officer is allowed to ask questions to either dispel or confirm any suspicions. After that search took place, and there's no firearm that's found, the difference here is, again, that's why I was pointing out that there's already been an offense for which Mr. Leggett is aware that he could be charged with the second degree trespass. And he's the sole target of the investigation, which is basically singly focused on finding the owner of the firearm. And every single one of those accusations, not questions, was directed at Mr. Leggett. And I would ask the court, there's no harm to the government in that situation where a reasonable person in the suspect situation would believe that their freedom of movement has been curtailed to a point where it's tantamount to a custodial formal arrest. What is the harm in requiring that the officer advise the defendant, who has a right not under the Fifth Amendment, not to be a witness against himself of their rights? And the concern is that he's not going to do that because the person may not be willing to talk. And that would have, that would not have presented any hardship to law enforcement in this situation. Counsel, moving, let's just for the sake of discussion, say we accept some of your arguments. He, of course, later is given his Miranda, advised of his Miranda rights. He's advised if he wants to continue talking, and he does. And, you know, the inquiry there is whether both statements are voluntary, but it's a, you know, it's a heightened voluntary standard. I mean, it's just the way you and I might normally think about voluntary. It's, you know, I think our case says, you know, a defendant has been overboard or his capacity for self-determination of payer. And, you know, and it's clearly more than just custody. How do you get past that? In your honor, as I said earlier, I don't have a case. Candidly, that's analogous to our facts for this court has found that the initial statement where there was coercion based on a general assurance. When that assurance was following through, I think all the cases where the officer made a promise where they found a coercion was involved was when the officer didn't follow through with that promise. Yeah. And sometimes when that happens, they still don't. Yeah, it wasn't voluntary. That's correct. Correct. So I would contend, again, each case, the facts are unique. And the situation of the not questions, repeated accusations that were geared towards solely towards Mr. Leggett. And then the court is to look at if there was coercion, if the statement, the initial unworn statement wasn't voluntary, then was the taint from that involuntary statement. Had it dissipated at the time of the second interview when he's Miranda's and the court says to look to circumstances such as the passage of time, change of location, whether it's different officers involved in the questioning. In this case, it's it's the same officer. In fact, the officer actually caught himself and he continued to question briefly. Mr. Leggett, after he placed the handcuffs, he asked him what kind of gun it was. And then he sort of caught himself and said, never mind. But it was the same officer that had done the initial interrogation who did the later interrogation down at the detention center. It's unclear from the record of the exact passage of time between the initial unborn statement and the Miranda statement. I would contend it was a relatively short period of time. And he's now in a different location where he's clearly in a at the detention center being interviewed, which is inherently intimidating environment. And so we've asked the court to find that the both statements, both that Mr. Leggett was in custody, that the first statement that was unworn was was involuntary. And the circumstances surrounding that second statement involuntary in violation of the Fifth Amendment. And ask this court find that court committed error and that the evidence, both statements should be expressed. Thank you. Thank you, counsel. As you now heard twice, we like to come down and greet you and say hello. It's an important part of our tradition. We hope to get back to it soon. But we thank you both for your arguments and appreciate you coming down to Charleston to be with us on this special occasion. Thank you so much. Clerk will adjourn court for the day. This course is adjourned.
judges: Julius N. Richardson, A. Marvin Quattlebaum Jr., Henry F. Floyd